**E-FILED**
Friday, 29 August, 2008  04:18:57 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| MICHAEL HEARN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-1293 |
| | ) | |
| CLETUS SHAW, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants, ROGER E. WALKER, JR., EDDIE JONES, and CLETUS SHAW, by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, and hereby submit their Memorandum of Law in Support of Defendants' Motion for Summary Judgment.

## INTRODUCTION

Plaintiff is an inmate of the Illinois Department of Corrections currently housed at Pontiac Correctional Center.  On November 1, 2007, Plaintiff filed his Complaint.  In Plaintiff's Complaint, Plaintiff alleges a 42 U.S.C. § 1983 suit against the Defendants claiming violations of his Eighth Amendment rights involving deliberate indifference to his serious medical needs.  (Complaint, generally).  This Court reviewed Plaintiff's Complaint pursuant to 28 U.S.C. § 1915A on December 6, 2007.  In the merit review, this Court found that the Plaintiff had stated a claim under the Eighth Amendment, deliberate indifference to his serious medical needs. Specifically, Plaintiff contends that his rights have been violated by the Defendants due to Plaintiff's exposure to unsanitary and extreme weather

conditions in the outside toilets and that the condition of the outside toilets interfered with the Plaintiff's ability to exercise.

## UNDISPUTED MATERIAL FACTS

1.     Plaintiff has been incarcerated continuously at Pontiac Correctional Center since January 2004.  (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 5:6-8).

2.     Plaintiff has been housed in protective custody at Pontiac Correctional Center.  (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 5:18-19).

3.     Protective custody is a unit within the Department of Corrections where inmates are housed if they feel threatened by other inmates, other officers or feel vulnerable. (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 5:13-17).

4.     Inmates in protective custody are given yard privileges five days a week. ((Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 6:12-13).

5.     Inmates are given one and a half hours to two hours for yard privilege. (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 6:21-23).

6.     Inmates follow a regular schedule as to what time they are allowed to go to the yard. (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 7:23-8:2).

7.     Inmates can choose not to go to the yard.  (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 7:10-12).

8.     On October 25, 2006, Plaintiff knew he was scheduled to go to yard, and he went to yard.  (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 8:3-8).

9.     The typical procedure was that if an inmate needed to urinate while he was out in the yard, he would use the outdoor toilet.  If an inmate had to defecate, while he was

in the yard, he would be allowed to go back into his cell. (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 8:23-9:6).

10.     On October 25, 2006, Plaintiff alleges that he asked to use the restroom in his cell, and his request was denied by Defendant Shaw. (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 10:3-9).

11.     Plaintiff had to use the outdoor toilet since he was not allowed back into his cell. (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 11:14-15).

12.     This incident happened only one time, as Plaintiff has not asked to use the indoor facilities since October 25, 2006. (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 11:23-12:3).

13.     Plaintiff did not get sick from using the outdoor facilities on October 25, 2006. (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 11:16-17).

14.     Plaintiff claims that his right to exercise has been violated as he has chosen not to go to yard when has had to use the restroom. (Defs.' Ex. A; Hearn Dep. Trans. dated July 23, 2008, 14:13-21).

15.     Plaintiff has brought this claim against Director Walker as he believes that Director Walker is ultimately responsible for Defendant Shaw's decision not to let him use the restroom inside his cell. (Defs.' Ex. B; Plaintiff's Answers to Defendants' Interrogatories, #3).

16.     Plaintiff has brought this claim against Warden Jones as he believes that Warden Jones facilitated Defendant Shaw's decision and Warden Jones denied his grievance on this matter. (Defs.' Ex. B; Plaintiff's Answers to Defendants' Interrogatories, #2).

3

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted only if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may discharge this burden by "showing . . . an absence of evidence to support the nonmoving party's case."  Id., 477 U.S. at 325.

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250; Matsushita Elec. Indus. Co., 475 U.S. at 587.  In determining whether the nonmovant has identified a "material" issue of fact for trial, "[o]nly dispute[s] that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."  McGinn v. Burlington Northern R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted).  A court must enter summary judgment against the plaintiff when the plaintiff fails to come forward with evidence that would reasonably permit a finder of fact to find in plaintiff's favor on a material question.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994); Int'l Union of Operating Eng'r v. Assoc. Gen. Contractors, 845 F.2d 704, 708 (7th Cir. 1988).

## ARGUMENT

### I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S EIGHTH AMENDMENT CLAIM.

In order to establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 105-106 (1976). Deliberate indifference requires the prison official to act with a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994) *quoting* Wilson v. Seiter, 501 U.S. 294, 297 (1991). Therefore, a prison official cannot be liable under the Eighth Amendment "unless he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer at 847 (1994). A prison official must reasonably respond to a prisoner's complaints, through the investigation and referral of a plaintiff's complaints, in order to be insulated from liability. Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006).

The Seventh Circuit has articulated that "the Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but only to that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable sate of mind." Snipes v. DeTella, 95 F.3d 586, 590 (7th Cir. 1996).

In this case, Plaintiff complains that his rights were violated when asked to use the restroom inside his cell. However, Plaintiff has admitted that he did not suffer any injury because he had to use the outdoor toilet to defecate one time. Plaintiff admitted that Defendant Shaw's denial of his use of the indoor restroom had never happened before and has not happened since. He only had to use the outdoor facility one time. As such, Plaintiff has not produced any evidence that would prove he was placed in a "substantial

risk of serious harm." Plaintiff must show that his health was indeed endangered. Henderson v. Sheahan, 196 F.3d 839, 846, 853 (7th Cir. 1999). As such, Defendants are entitled to summary judgment.

## II.   PLAINTIFF'S RIGHT TO EXERCISE WAS NOT VIOLATED.

The Seventh Circuit has recognized that "[l]ack of exercise may certainly rise to a constitutional violation. Where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised. French v. Owens, 777 F.2d 1250 (7th Cir.1985). To deny a prisoner all opportunity for exercise outside his cell would, the cases suggest, violate the Eighth Amendment unless the prisoner posed an acute security risk if allowed out of his cell for even a short time. Anderson v. Romero, 72 F.3d 518, 527 (7th Cir. 1995). In this case, Plaintiff claims that his right to exercise was violated because he would forgo some opportunities to go to yard if he felt he might have to use the bathroom. Unlike inmates that have brought this claim before, Plaintiff had the opportunity to go to yard, he just chose to not act on this opportunity. He made the decision not to go to yard because he thought he might need to use the toilet inside his cell. As such, Defendants are entitled to summary judgment as to this claim.

## II.   DEFENDANTS WALKER AND JONES WERE NOT PERSONALLY INVOLVED, AND AS SUCH THEY SHOULD BE GRANTED SUMMARY JUDGMENT.

"The doctrine of *respondeat superior* does not apply to §1983 actions; thus to be held individually liable, a defendant must be 'personally responsible for the deprivation of a constitutional right.'" Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001), quoting Chavez v. Ill. State Police, 251 F.3d 612, 651 (7th Cir. 2001). Defendants in a suit brought pursuant to 42 U.S.C. § 1983 can only be held liable for their individual wrongdoing.

Duckworth v. Franzen, 780 F.2d 645, 650 (7th Cir. 1985).  To be personally involved, defendants must act (or fail to act) with a deliberate or reckless disregard of the plaintiff's constitutional rights or must direct or knowingly consent to the conduct alleged to constitute the violation.  Smith v. Rowe, 761 F.2d 360, 369 (7th Cir. 1985); Crowder v. Lash, 687 F.2d 996, 1005 (7th Cir. 1982).

Plaintiff has stated that Defendants Walker and Jones are named in this suit because they supervise Defendant Shaw.  Additionally, Defendants Walker and Jones or their designees answered Plaintiff's grievance about having to use the outdoor toilet.  However, neither Defendant Walker nor Defendant Jones has any personal involvement in this case. Plaintiff had to use the outdoor toilet one time.  He filed a grievance about that instance, and he has not had to use the outdoor toilet since.  Plaintiff stated that the normal procedure was that if an inmate in protective custody needed to defecate, he would be allowed back to his cell.  There is no indication that Defendants Walker or Jones knew about this instance or were personally involved.  As such, they lack the required personal involvement that is needed in this case. Plaintiff states that Defendants were made aware from the grievance procedure, but Plaintiff's grievance would have been filed after the event and no similar event has happened since to the Plaintiff.  Therefore, Defendants Walker and Jones cannot be held liable for the alleged actions of the other Defendant.  Accordingly, Defendants Walker and Jones are entitled to summary judgment in this matter.

## III.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

To the extent that Plaintiff may be suing the Defendants in their individual capacities, Defendants are entitled to qualified immunity.  In order to defeat a claim of

qualified immunity, a plaintiff must prove the defendants violated a constitutional right clearly established at the time of the alleged misconduct.  McGrath v. Gillis, 44 F.3d 567, 670 (7th Cir. 1995).  Plaintiff has the burden of establishing the existence of a clearly established constitutional right.  Id. at 570 citing Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988).  Clearly established rights must be proven through closely analogous cases.  Id. at 570.  Therefore, through qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Under Wilson v. Seiter, conditions that merely cause inconvenience and discomfort or make confinement unpleasant do not rise to the level of constitutional violation.  501 U.S. at 298.  See also, Kendrick v. Freeman, 2008 WL 1816465, 3 (USDC-NDIN, 2008)(holding that an inmate who did not have access to a toilet for hours at a time did not allege a constitutional violation).

Defendants do not know of any case law that would put them on notice that refusal to allow Plaintiff access to the toilet during his two hour yard privilege would be a constitutional violation; thus, Defendants would be entitled to qualified immunity.

IV.    DEFENDANTS ARE ENTITLED TO SOVEREIGN IMMUNITY

The Eleventh Amendment bars suits against state officials when the state is the real substantial party in interest.  Pennhurst State Sch. & Hosp., 465 U.S. 89, 101 (1984) citing Ford Motor Co. v. Dept. of Treasury of Indiana, 323 U.S. 459, 464 (1945).  Suits against state officials in their official capacities are suits against the state, Kentucky v. Graham, 473 U.S. 159, 167 (1985), even though the state may not be a named party to the action.

<u>Edelman v. Jordan</u>, 415 U.S. 651, 662 (1974).  The Eleventh Amendment did not create the sovereign immunity that the states enjoy, but merely ratified the immunity that was based in the Constitution and in common law.  <u>Alden v. Maine</u>, 527 U.S. 706 (1999).

In this case, Plaintiff sued the Defendants in their official capacities.  Suits for damages against officials in their official capacities are considered suits against the State and are barred by the Eleventh Amendment.  Summary judgment should be granted to the Defendants as to being sued in their official capacities.

WHEREFORE, for the above and foregoing reasons, Defendants respectfully request this Honorable Court grant their Motion for Summary Judgment.

Respectfully submitted,

ROGER E. WALKER, JR., EDDIE JONES, and CLETUS SHAW,

Defendants,

LISA MADIGAN, Attorney General State of Illinois,

Jacob H. Smith, #6290790                              Attorney for Defendants,
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-9014                           By: s/Jacob H. Smith
                                              Jacob H. Smith
Of Counsel.                                   Assistant Attorney General

9

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2008, I electronically filed Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

      none

and I hereby certify that on August 29, 2008, I mailed by United States Postal Service, the document to the following non-registered participant:

      Michael Hearn, #B-82910
      Pontiac Correctional Center
      P.O. Box 99
      Pontiac, IL 61764

              Respectfully submitted,

               s/ Jacob H. Smith_____
              Jacob H. Smith, #6290790
              Assistant Attorney General
              500 South Second Street
              Springfield, IL  62706
              Telephone:  (217) 782-9014
              Facsimile:  (217) 524-5091
              jsmith@atg.state.il.us

1           IN THE UNITED STATES DISTRICT COURT
      FOR THE CENTRAL DISTRICT OF ILLINOIS
2                   PEORIA DIVISION

3

4     MICHAEL HEARN,

5           Plaintiff,

6           -vs-                    No. 07-1293

7     CLETUS SHAW, EDDIE JONES, and
      ROGER WALKER,

8           Defendants.

9

10          **DEPOSITION of MICHAEL HEARN**
      taken on July 23, 2008, at Pontiac Correctional
11    Center, Pontiac, Illinois, commencing at
      approximately 11:00 A.M., before Lynn J. Watson, a
12    Certified Shorthand Reporter, pursuant to Notice.

13

14          APPEARANCES:

15          LISA MADIGAN, ILLINOIS ATTORNEY GENERAL
            BY:  MR. JACOB H. SMITH
16          500 South Second Street
            Springfield, Illinois 62706
17              Representing the Defendants.

18

19

20

21

22

23

24

DEFENDANT'S
EXHIBIT
A

<u>MICHAEL HEARN</u>

1

2  called as a deponent herein, after having been

3  first duly sworn on his oath, was examined and

4  testified as follows, to-wit:

5                    EXAMINATION

6  BY MR. SMITH:

7      Q.   Mr. Hearn, my name is Jacob Smith.  I

8  represent the defendants in this case.  Did you

9  receive the text order from the judge?

10     A.   Yeah.

11     Q.   Okay.  Can you state your name for the

12  record, please?

13     A.   Michael G. Hearn.

14     Q.   Can you spell your last name?

15     A.   H-e-a-r-n.

16     Q.   And your DOC number?

17     A.   B as in boy 82910.

18     Q.   How old are you?

19     A.   I'm 23.

20     Q.   Where were you born?

21     A.   Marion, Illinois.

22     Q.   What year were you born?

23     A.   1984.

24     Q.   Have you been in a deposition before?

1       A.   No.

2       Q.   Just to give you a little background and

3   some instructions, it's a chance for me to ask you

4   questions to understand your claims that you

5   brought in the case.  Things that make this a

6   little more clear is say yes or no if it's yes or

7   no questions because uh-huhs and huh-uhs get

8   confused in transcription.

9          The lady to my left across the table from

10  you is writing everything down.  If you'd like a

11  copy of this, we'll explain how you can get one

12  later.  You'll have to pay for one, as do I.  This

13  is her property, and that's how she makes her

14  living.  Do you have any questions before we get

15  started?

16      A.   No.

17      Q.   Great.  Are you under any medication

18  today?

19      A.   No.

20      Q.   So nothing that would impair your memory?

21      A.   No.

22      Q.   What's the highest level of education you

23  have completed?

24      A.   My junior year in high school.

4

1     Q.   Where was that?

2     A.   Marion, Illinois.

3     Q.   Have you taken any classes while in DOC?

4     A.   Yes, sir.

5     Q.   What?

6     A.   I have obtained my GED, which was a little

7 bit over a year ago, and I took anger management,

8 substance abuse, criminal thinking, substance abuse

9 rehabilitation, and I'm on my fifth module, which

10 is aftercare.

11    Q.   Does that mean like different steps like a

12 module?

13    A.   Yes, sir.

14    Q.   How many different steps are there?

15    A.   Five total.

16    Q.   Five total.  Do you have any plans of

17 doing anything after that is over?

18    A.   There isn't anything that they offer

19 besides that.

20    Q.   What year were you convicted?

21    A.   I was convicted in 2002.

22    Q.   In what county?

23    A.   Williamson County.

24    Q.   What institution did you arrive at first?

1      A.   Menard, Illinois -- or, yeah.  I'm sorry.

2      Q.   Menard Correctional Center?

3      A.   Yeah.

4      Q.   How long have you been here in Pontiac?

5      A.   I have been in Pontiac since January 2004.

6      Q.   And you have been here continuously since

7   January 2004?

8      A.   Yes, sir.

9      Q.   And your accident that you complained

10   about in your complaint arises out of Pontiac?

11      A.   Yes, sir.

12      Q.   What is protective custody?

13      A.   Protective custody is a unit within the

14   Department of Corrections where if individuals feel

15   threatened by other inmates, other officers, or

16   feel vulnerable, they are able to sign into

17   protective custody to have more protection.

18      Q.   Are you housed in protective custody?

19      A.   Yes, sir.

20      Q.   About how many inmates are in protective

21   custody?

22      A.   I would say approximately 480 to 500

23   people.

24      Q.   Is it one big building?

6

```
 1          A.   Yes, sir.

 2          Q.   How many floors?

 3          A.   Six floors.

 4          Q.   Two different wings?

 5          A.   There's two different sides of the

 6     building, yes.

 7          Q.   All right.  How often are you given

 8     showers?

 9          A.   Three times a week.

10          Q.   Is it the same days every week?

11          A.   Yes, sir.

12          Q.   How often are you given yard privileges?

13          A.   Five days a week.

14          Q.   What days are you not given yard

15     privileges?

16          A.   Particular to the gallery that I'm on now?

17          Q.   Yes.

18          A.   Wednesdays and Saturdays.

19          Q.   What time do you have yard?

20          A.   It depends on what day it is.

21          Q.   How often -- how long are you out on yard?

22          A.   Approximately one and a half hours to two

23     hours.

24          Q.   How big is the yard?  Football size field
```

1  or --

2      A.  Well, there's two.  One of them is

3  probably the size of a football field, and the

4  larger one is probably the size of two football

5  fields.

6      Q.  Do you have access to both yards?

7      A.  It just depends how many people goes to

8  yard and whether the lieutenant of the cell house

9  wants to place the individuals on yard.

10      Q.  Can inmates choose not to go out to the

11  yard?

12      A.  Yes.

13      Q.  How many inmates can be out in the yard at

14  one time?

15      A.  I've seen over a hundred people in the

16  yard before.

17      Q.  But it varies because some inmates will

18  choose not to go sometimes?

19      A.  Yes.

20      Q.  Does it run in shifts like different

21  galleries go different times?

22      A.  Yes, sir.

23      Q.  But once you are in a gallery, that time

24  is pretty consistent like if you were in Gallery 1,

8

1    you'd go at 9:00 a.m. every Monday kind of thing?

2        A.    Yeah.

3        Q.    Okay.   Turning to October 25th, 2006, were

4    you on the yard that day?

5        A.    Yes, sir.

6        Q.    Did you know that you were going to go to

7    the yard that day?

8        A.    Yes, sir.

9        Q.    Do you remember what time you were going

10    to the yard that day?

11        A.    Yard on that morning probably started

12    about 8:30, somewhere in between 8:00 and 8:30.

13        Q.    Did you have to use the restroom before

14    you went out to the yard?

15        A.    No.

16        Q.    What time did you have to use the

17    restroom?

18        A.    I'm guessing about 8:45.   It was fairly

19    soon after they placed us on yard.

20        Q.    Have you ever had to use the restroom

21    before while you are out on yard?

22        A.    Yes.

23        Q.    What happened beforehand, before October

24    25th, like if you had to use the bathroom, what

1    would you do and what happened?

2        A.    Well, if I had to urinate, I would

3    urinate.    But if I had to defecate, I would ask the

4    officer to let me in.

5        Q.    Would they?

6        A.    Yeah.

7        Q.    Well, who did you ask on October 25th?

8        A.    Well, I asked three different officers on

9    October 25th.

10        Q.    Who?

11        A.    The first officer, his name was -- his

12    first initial of his name was T.    His last name was

13    Lindsey.    I asked him when he was walking down the

14    walk if he could ask the desk officer if she would

15    let me in, and he said he'd see about it, and he

16    went in and never came out.

17            Then an inmate came out of the door that

18    Officer Lindsey went in, and the inmate's name is

19    Reuben Hernandez, and I asked him, I said, could

20    you please ask Miss Salzman (phonetic), who was the

21    desk officer, if I can use the bathroom.    And he

22    came back out and said, "Per Lieutenant Shaw, no."

23            So then I asked Mr. Hernandez to go in

24    there and ask Lieutenant Shaw to come out so I

10

1    could talk to him, and Lieutenant Shaw was the

2    third person that I asked.

3        Q.   What did you say to Lieutenant Shaw?

4        A.   I told him that I had to defecate, and I

5    asked him if I could come in and use the bathroom,

6    go into my cell.

7        Q.   And what did he say?

8        A.   He said no.  People in the Army had to

9    shit outside.

10       Q.   About what time was that?

11       A.   Around 8:45.

12       Q.   So that all happened within minutes?

13       A.   Yes.

14       Q.   You asked all those people within five

15   minutes?

16       A.   Yes, sir.

17       Q.   And you would have left the yard at what

18   time?

19       A.   10 o'clock approximately.

20       Q.   Was it usually longer or shorter when you

21   say approximately?

22       A.   Well, it depends on who the lieutenant is.

23   If the lieutenant in the cell house is pretty

24   easy-going, for lack of a better term, he would let

1    us stay out 10, 15 minutes after that.  But

2    Lieutenant Shaw usually runs it, you know, right at

3    that time.

4        Q.  So after he said no, what happened?

5        A.  After he said no, I said, well, then I

6    need to use -- I need to have some toilet paper

7    because there was feces on the toilet, on the

8    toilet seat things.  For lack -- I don't know how

9    to describe it.  It's a metal cone coming up out of

10   the concrete, and there's a big old tank below that

11   has excrement in it.

12       Q.  What did he say with that?

13       A.  He told me no.

14       Q.  Did you use the toilet anyway that day?

15       A.  Yes, sir.

16       Q.  Did you get sick from using the toilet?

17       A.  No.

18       Q.  Have you been on yard since then?

19       A.  Why.

20       Q.  Have you had to use the restroom since

21   then while you were out on yard?

22       A.  Yes.

23       Q.  Have they let you back inside, or did they

24   keep you outside again?

1    A.    I've never had to defecate, only urinate.

2    Q.    So this is a one-time incident?

3    A.    Yeah.

4    Q.    Just to be clear, why exactly are you

5    suing Director Walker?

6    A.    Director Walker was aware of the situation

7    when I filed the grievance to him, and the

8    grievance process leads up to him and stops at him,

9    and he failed to do anything about it.

10    Q.    When you say he failed to do anything

11    about it, you said this is a one-time incident.

12    What would he do differently?

13    A.    Well, for instance, he could have issued a

14    memo, which is within his power, instructing all

15    DOC staff here at Pontiac when that situation

16    presents itself, that they let us inside or provide

17    us with toilet paper like they are supposed to.

18    Q.    But that you never -- how do you know that

19    didn't happen?

20    A.    Because I have seen other individuals

21    defecate on the yard and asked the officers, and

22    the officers have refused to bring any toilet

23    paper.

24    Q.    But you yourself have never had that

13

1    problem?

2        A.   No, sir, not since that one incident.

3        Q.   And Eddie Jones?

4        A.   Mr. Jones was aware that the conditions of

5    the toilet since he's been the warden here.  He's

6    walked past that toilet numerous occasions and has

7    talked to inmates during those occasions.  And when

8    I filed my grievance, the grievance went across his

9    desk, and he signed off on it as basically being a

10   moot point, that Lieutenant Shaw did nothing about

11   it and -- or that, excuse me, that Lieutenant Shaw

12   didn't do anything wrong.  I guess that was his

13   opinion.

14       Q.   Have you -- did you speak directly to

15   Warden Jones?

16       A.   Yes.

17       Q.   What did you say to him?

18       A.   I told him about his staff member refusing

19   to give me toilet paper, and I told him about the

20   conditions of the toilet out here, that there was

21   feces on the toilet, there's no sinks to wash our

22   hands, there's no soap to wash my hands.

23       Q.   But since October 25th, 2006, you've never

24   had to go inside again?

14

1       A.    To defecate?

2       Q.    Right.

3       A.    No.

4       Q.    Are there any other claims that I am

5    missing besides this one incident?  Is that the

6    entire case?

7       A.    No.   The judge let my case proceed on two

8    claims of 8th Amendment violation, one being the

9    conditions of the toilet and the other being that

10    interfering with my right to exercise.

11       Q.    Your right to exercise?

12       A.    Yes, sir.

13       Q.    Can you explain that claim to me?  What do

14    you mean by that?

15       A.    Well, I've had other occasions where I

16    couldn't go to yard, and I refused to go to yard

17    because I had to use the bathroom and it was almost

18    time for them to run the yard line out.   And

19    because I have known I wasn't able to get toilet

20    paper before and the conditions of the toilet, I

21    refused to go to yard on those days.

22       Q.    So how did that prevent you from

23    exercising?

24       A.    Well, I have a right to exercise.   And if

15

1    I go outside and have to use the bathroom so bad, I

2    can't exercise.  And if I know I can't use the

3    toilets out there, what's the purpose of me going

4    out?  I mean it's dehumanizing.

5        Q.  Can you ever exercise in your cell?

6        A.  No.  Well, certain things you probably

7    could, but the cells are so small.  I can stretch

8    my arms out the width of the cell and touch both

9    walls.

10       Q.  What about lengthwise?

11       A.  They are probably about seven feet.

12       Q.  So you couldn't touch it --

13       A.  No.

14       Q.  -- with both hands?

15       A.  Right.

16       Q.  I think that's all the questions I have

17   for you.  The Interrogatories, you are going to get

18   those to me by the end of next week?

19       A.  Yes, sir.

20       Q.  Great.  Thank you.

21       A.  Can I ask a question off the record?

22       Q.  Talking about signature, you can either

23   reserve your right to sign, or you can waive it.

24   Basically, if you reserve it, you review it, make

16

1    sure everything is spelled correctly.  You can

2    change that.  It's not a copy for you to keep.

3    You'll probably be taken into a room similar to

4    this one, read it and sign it, and then it comes

5    back to the court reporter here.  Or you can waive

6    it and assume that what she has written is correct.

7         A.   I would like to review it, please.

8         Q.   Okay.

9

10            (FURTHER THE DEPONENT SAYETH NOT.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

17

```
 1    STATE OF ILLINOIS          )
                                 ) SS.
 2    COUNTY OF LIVINGSTON       )

 3

 4          I, LYNN J. WATSON, a Certified Shorthand

 5    Reporter in and for the County of Livingston and

 6    State of Illinois, do hereby certify that the

 7    deponent herein, prior to the taking of said

 8    deposition, was by me duly sworn to testify the

 9    truth in the cause aforesaid in the caption to this

10    deposition insofar as he might be interrogated

11    concerning the same; and that the said deposition

12    was on that date taken stenographically and

13    afterwards transcribed by me, and that the

14    foregoing is a true and accurate transcript of the

15    testimony so given on said date.

16          Dated August 21, 2008.

17                        —

18          s/Lynn Watson
             Court Reporter

19          C.S.R., R.P.R.
            C.S.R. License No. 84-1744

20

21

22

23

24
```

E-FILED
Friday, 29 August, 2008  04:20:12 PM
Clerk, U.S. District Court, ILCD
E-FILED
Tuesday, 29 July, 2008  01:16:40 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

MICHAEL HEARN,                         )
        Plaintiff,              )
                                )
                                )
    -vs-                       )     Case No. 07-1293
                                )
                                )
                                )
CLETUS SHAW,                           )
        Defendant(s).           )

## NOTICE OF COMPLIANCE

    The plaintiff MICHAEL HEARN, pro se, and hereby notify this Honorable Court

of his **FULL COMPLIANCE** with this Court July 22, 2008 ORDER directing him to answer

the Defendants' set of interrogatories within 7 days.  Accordingly, plaintiff

simultaneously files such answers herewith.

                               **Respectfully submitted.**

                       s/Michael Hearn

                               MICHAEL HEARN
                               B-82910,

                               PONTIAC CORRECTION-
                               AL CENTER,
                               700 W. LINCOLN AVE./
                               P.O. BOX 99,
                               PONTIAC, IL. 61764.



DEFENDANT'S EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

MICHAEL HEARN,                      )
        Plaintiff,              )
                      )
                      )
     -vs-                            )     Case No. 07-1293
                      )
                      )
CLETUS SHAW,                         )
        Defendant(s).               )

## PLAINTIFF'S RESPONSE TO DEFENDANTS' INTERROGATORIES* TO PLAINTIFF

The plaintiff MICHAEL HEARN, pro se, and hereby answers the following interrogatories separately and fully in writing under oath and in accordance with Federal Rules of Civil Procedure 33 and in full compliance with this Court's July 22, 2008 ORDER directing the same. In support thereof, plaintiff states as follows:

1. State with specificity all claims made against Defendant Cletus Shaw.

    (a) For each claim, state the specific legal basis, theory or statute upon which you rely for recovery.

    (b) For each claim, state the specific action or inactions of Defendant Shaw relied upon to establish the claim.

    (c) For each claim, state the damages or injuries you suffered as a result of the Defendant's alleged actions.

    (d) For each of the above answers, what evidence do you have to support your claim?

RESPONSE:

    (a) The specific "legal basis" upon which plaintiff rely for recovery is based on an alleged deprivation of his right to decent prison conditions and his right to be free from unjustified interference with the enjoyment of his right to exercise outside of his cell, rights secured

---

*Note: A response to "DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFF."

1:07-cv-01293-HAB-JAG    # 27    Page 3 of 6

him under the Eighth Amendment of the United States Constitution, specifically, for being forced to be exposed to **unsanitary** and **extreme weather conditions** while using the outside toilet during his yard period, despite the fact that there was an easily accessible alternative available, namely, to simply allow me to use the indoor toilet.

(b) The "specific actions or inactions" of Defendant Shaw relied upon to establish the claim where Defendant Shaw was made aware of the unsanitary and extreme weather conditions plaintiff would be exposed to while using the outside toilet during his yard period, yet in callous or reckless disregard for the rights of others, he refused to provide me with toilet paper or to allow me to use the indoor toilet and further with the intent of humiliating me stated in the presence of several prisoners and staff that:"People in the army have to shit outside," in caprious disregard that there were no functioning sinks, soap nor tissue and approximately 85 to 100 prisoners sharing two toilets in the frigid cold.

(c) The plaintiff seeks punitive damages under the no physical injury exception observed in Calhoun v. DeTella, 319 F.3d 936 (C.A. 7th Ill. (2003)).

(d) The evidence the plaintiff has to support his claim is the witnesses named in his grievance that were present, as well as the filings on record in the instant case.

2.  State with specificity all claims made against Defendant Eddie Jones.

(a) For each claim, state the specific legal basis, theory or statute upon which you rely for recovery.

(b) For each claim, state the specific actions or inactions of Defendant Shaw relied upon to establish the claim.

(c) For each claim, state the damages or injuries you suffered as a
result of the Defendant's alleged actions.

(d) For each of the above answers, what evidence do you have to supp-
ort your claim?

RESPONSE:

(a) Plaintiff reasserts the legal basis set forth under subparagraph
(a) of paragraph 1 herein.

(b) The specific actions or inactions of Defendant Jones relied upon
to establish the claim is that he personally condoned and facilitated
Defendant Shaw's misconduct by purposefully ignoring plaintiff's
grievance, despite the fact that the record shows staff repeatedly
disregarding or ignoring the substance of the plaintiff's complaint
and evidence, namely, his witnesses named in the grievance itself
(See Vance v. Peters, 97 F.3d 987 (7th Cir. 1996)) and where Defend-
ant Jones was himself callous or recklessly indifferent to the rights
of others, in particular, where he was personally responsible for
directing or approving any construction within the institution and
knew that there was no functioning sinks available at the outside toi-
lets that approximately 450 to 475 prisoners share while defecating
and urinating, yet failed to direct his subordinates to provide funct-
ioning sinks, despite the fact that he personally knew of the risk
prisoner would be exposed to for failing to wash their hands, especial-
ly, where he has personally issued a Memorandum letter instructing
inmates and staff to wash their hands in 2007.

(c) The plaintiff seeks punitive damages under the no physical injury ex-
ception observed in Calhoun, 319 F.3d 936 (C.A. 7th Ill. (2003)).

(d) The evidence the plaintiff has to support his claim is departmental
record.

3. State with specificity all claims made against Defendant Roger E. Walker.

    (a) For each claim, state the specific legal basis, theory or statute upon which you rely for recovery.

    (b) For each claim, state the specific actions or inactions of the Defendant Walker relied upon to establish the claim.

    (c) For each claim, state the damages or injuries you suffered as a result of the Defendant's alleged actions.

    (d) For each of the above answers, what evidence do you have to support your claim?

**RESPONSE:**

    (a) Plaintiff reasserts the legal basis set forth under subparagraph (a) of paragraph 1 herein.

    (b) The specific actions or inactions of Defendant Walker relied upon to establish the claim is that Defendant Walker in an exercise of his final decision making authority in an arbitrary and caprious fashion or in gross negligence in managing someone whose conduct he is personally responsible for, and thereby condoning his subordinates' action.

    (c) The plaintiff seeks punitive damages.

    (d) The evidence the plaintiff has in support of his claim is based on or is departmental record.

4. How long are you allowed for recreation/yard privileges?

**RESPONSE:**

2 hours.

5. How often are you allowed to go to recreation/yard in given week?

**RESPONSE:**

5 days a week.

6. Is recreation or yard at the same time every day?

**RESPONSE:**

No.

7.   Can you refuse yard or recreation?

     RESPONSE:

     Yes, if you are not given a direct order by an officer.  So it is a conditional

     yes.

8.   I swear under penalty of perjury that the foregoing matter is true and correct

     as to those matter based on personal knowledge, except for those matter based

     on information and belief but to the same I believe to be true to the best of

     my knowledge.

Date: July 25, 2008                              s/Michael Hearn

                                   MICHAEL HEARN
                                   B-82910,

                                   PONTIAC CORRECTINAL
                                   CENTER,
                                   700 W. LINCLON AVE./
                                   P.O. BOX 99,
                                   PONTIAC, IL. 61764.